[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-15703
Non-Argument Calendar

_____

Agency No. A087-380-029

ION ZAPOROJAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(October 9, 2012)

Before BARKETT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Petitioner Ion Zaporojan seeks review of the Board of Immigration Appeals's ("BIA") denial of his motion to reopen his removal proceedings, filed pursuant to 8 C.F.R. § 1003.2(c).  After review, we deny the petition for review.[1]

## I.  BACKGROUND FACTS

### A.    Asylum Proceedings

Petitioner Zaporojan is a native of Moldova and a citizen of Moldova and Romania.  In 2006, Zaporojan entered the United States and then overstayed his visitor's visa.  In 2009, Zaporojan filed an application for asylum, withholding of removal and relief under the Convention Against Torture ("CAT").  Shortly thereafter, Zaporojan was placed in removal proceedings, where he conceded his removability.

Zaporojan's asylum application alleged past persecution and a well-founded fear of future persecution in Moldova based on his political opinion and his membership in a particular social group, specifically his father's family. Zaporojan's father was a businessman and local politician in Soroca, Moldova.  In 2005, Zaporojan's father was killed just before he was to testify against a local

---

[1]We review the denial of a motion to reopen for abuse of discretion.  Jiang v. U.S. Att'y Gen., 568 F.3d 1252, 1256 (11th Cir. 2009).  "Our review is limited to determining whether there has been an exercise of administrative discretion and whether the matter of exercise has been arbitrary or capricious."  Ali v. U.S. Att'y Gen., 443 F.3d 804, 808 (11th Cir. 2006).

mafia member about extortion and public corruption.  Thereafter, a journalist delivered a cassette tape to Zaporojan's mother containing taped conversations between Zaporojan's father and Moldovan officials.  Zaporojan claimed that the Moldovan mafia and police had targeted, and would continue to target, Zaporojan, his mother and his brother in an effort to obtain the incriminating cassette tape.

After a hearing, the Immigration Judge ("IJ") denied all requested relief. The IJ concluded, among other things, that Zaporojan was statutorily ineligible for asylum and withholding of removal because: (1) Zaporojan did not show a nexus between the harm he had suffered in Moldova and a statutorily protected ground; and (2) Zaporojan, as a Romanian citizen, could live in another country within the European Union ("E.U.") and avoid harm by the Moldovan mafia.

In a May 19, 2011 decision, the BIA agreed with the IJ and dismissed Zaporojan's appeal.  The BIA concluded that Zaporojan had not shown that his attackers were motivated by his familial relationship to his father or his political opinion.  Rather, Zaporojan's attackers were motivated by a desire to obtain the cassette tape containing incriminating evidence, which was not a statutorily protected ground.  As to future persecution, the BIA agreed that Zaporojan had not shown a likelihood of harm given that: (1) the Moldovan mafia had little influence outside Moldova and Romania; (2) Zaporojan could live anywhere in the E.U.;

3

and (3) his mother lived unharmed in Italy.  This Court denied Zaporojan's

petition for review.  Zaporojan v. U.S. Att'y Gen., 450 F. App'x 904 (11th Cir.

2012).

**B.    Motion to Reopen**

On August 10, 2011, Zaporojan filed a timely motion to reopen with the

BIA.[2]  Zaporojan's motion to reopen claimed that he had new evidence that the

Moldovan government continued to seek him internationally to arrest him on

fabricated charges.  Zaporojan attached: (1) a February 7, 2011 document issued

by the Soroca Police Department stating that Zaporojan "was announced in the

international search, as well as participated in founding and organizing the

manifestation of popular movement against the leadership state" and "[a]gainst

him extent of arrest was chosen"; (2) a May 24, 2011 statement from Alexandru

Sirbu, Zaporojan's tenant at the family home in Soroca, stating that, in January

2011, police came to the house and asked Sirbu where Zaporojan, his mother and

his brother were and told Sirbu that if he wanted to have a normal life, he must let

them know if he found out something about the Zaporojan family, and, on

---

[2]Zaporojan also moved for reconsideration of the BIA's final order of removal.  In his petition for review, Zaporojan does not challenge the BIA's denial of that motion.  Thus, we do not address it.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (stating that when petitioner fails to offer argument on an issue, that issue is abandoned).

February 9, Sirbu found a letter from the police department in the mailbox, which he gave to Mihai Prepelita, Zaporojan's uncle; and (3) a May 26, 2011 statement by Mihai Prepelita stating that Prepelita received the police department letter from Sirbu, opened it and found two documents stating that Zaporojan and his brother "are in International search," and that Prepelita then called Zaporojan's mother to warn them and sent the documents to the brothers in the United States.

The BIA denied Zaporojan's motion to reopen. The BIA concluded that Zaporojan's "limited evidence proffered with the request for reopening has not been shown to meet the requirements for reopening the respondent's removal proceedings." The BIA elaborated that the evidence did not "sufficiently reflect that there exists a reasonable possibility that the respondent would be targeted for harm rising to the level of persecution on account of his membership in a particular social group or other protected ground." The BIA also determined that the evidence did not "make a prima facie showing that the government of Moldova would torture or acquiesce in the torture of the respondent."

## II. DISCUSSION

An alien's motion to reopen "shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." Immigration and Nationality Act ("INA")

5

§ 240(c)(7)(B), 8 U.S.C. § 1229a(c)(7)(B).  The BIA may grant the motion if the alien presents new evidence that is material and could not have been discovered or presented at the removal hearing.  Id. § 240(c)(7)(C)(ii), 8 U.S.C. § 1229a(c)(7)(C)(ii); see also 8 C.F.R. § 1003.2(c)(1).  An alien moving to reopen bears "a heavy burden" with respect to materiality in that he must show "that, if the proceedings were opened, the new evidence would likely change the result in the case."  Jiang v. U.S. Att'y Gen., 568 F.3d 1252, 1256-67 (11th Cir. 2009); Ali v. U.S. Att'y Gen., 443 F.3d 804, 813 (11th Cir. 2006).  Thus, the BIA may deny a motion to reopen if the new evidence does not establish prima facie eligibility for relief.  Al Najjar v. Ashcroft, 257 F.3d 1262, 1302 (11th Cir. 2001).

To establish prima facie asylum eligibility,[3] an applicant must show past persecution or a fear of future persecution on account of a protected ground, which includes political opinion or membership in a particular social group.[4]  INA § 101(a)(42), 8 U.S.C. § 1101(a)(42)(A); Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1230-31 (11th Cir. 2005).  Under the REAL ID Act of 2005, an asylum

_____

[3]Similarly, to be eligible for withholding of removal, an alien must show it is more likely than not that he will be persecuted on account of a protected ground.  INA § 241(b)(3), 8 U.S.C. § 1231(b)(3).  Because this standard is higher than the standard for asylum, an alien who fails to show asylum eligibility also cannot show eligibility for withholding of removal.  Sepulveda, 401 F.3d at 1232-33.

[4]The INA does not define "particular social group."  However, because the parties do not dispute that a family is a "particular social group," we do not address this issue.

6

applicant must show that a protected ground "was or will be at least one central reason" for the persecution.  INA § 208(b)(1)(B)(i), 8 U.S.C. § 1158(b)(1)(B)(i).[5]

Evidence of acts of private violence or criminal activity, however, do not demonstrate persecution on account of a protected ground.  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1258 (11th Cir. 2006).  Additionally, where an asylum applicant can avoid the feared persecution by relocating, and it would be reasonable to expect the applicant to do so, he cannot establish a well-founded fear of persecution.  Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1352 (11th Cir. 2009); 8 C.F.R. §§ 1208.13(b)(2)(ii), 208.16(b)(3)(i).

Here,  the BIA did not abuse its discretion in denying Zaporojan's motion to reopen.  Zaporojan's original asylum application was denied on the ground that he was statutorily ineligible for relief because he had not shown the required nexus to a protected ground.  Specifically, Zaporojan's evidence at the initial removal hearing did not show that the Moldovan police and mafia had targeted him because of his imputed political opinion or because he was his father's son.  Rather, it was undisputed that the Moldovan police and mafia were interested in Zaporojan because they believed he had an audio cassette containing incriminating

---

[5]Because Zaporojan's 2009 asylum application was filed after May 11, 2005, the REAL ID Act provisions apply to his case.  See Pub. L. No. 109-13, § 101(h)(2), 119 Stat. 302, 305-06.

evidence, which they wanted to recover.  Zaporojan also had not shown: (1) that he risked harm outside of his hometown of Soroca, where all of the threats and attacks occurred; or (2) that he, as a Romanian citizen, could not avoid the harm by living elsewhere within the E.U.

Zaporojan's newly proffered evidence would be unlikely to change that result.  Zaporojan contends that his new evidence shows that the Soroca police department fabricated a criminal charge against him and seeks him as an international fugitive.  The problem for Zaporojan is that his new evidence still does not show a motive that implicates a protected ground.  Indeed, the new evidence provides no explanation for why the Soroca police department would fabricate a charge and continue to hunt for Zaporojan.  The only motive Zaporojan has ever given is the cassette tape of incriminating evidence, which the BIA already concluded was not "on account of" a protected ground.

Zaporojan's new evidence also does not establish a well-founded fear of persecution.  As a Romanian citizen, Zaporojan still has the ability to live and work anywhere in the E.U.  Zaporojan's appeal brief claims the Moldovan government "has taken steps to hunt him internationally on Interpol," but his new evidence does not support this statement.  First, the document does not mention Interpol, much less state that the Moldovan government has taken whatever steps

8

are necessary for Zaporojan to be "hunted" through Interpol.  Second, it is not clear from the translation of the Soroca police department's document exactly what steps, if any, the Soroca police department took against Zaporojan.  A generous reading suggests that Zaporojan was charged with an offense, a warrant was issued for his arrest and an "international search" then "was announced."  Zaporojan submitted no other evidence as to the meaning of this document and whether it could be used to harm him outside of Soroca or elsewhere in the E.U.

In addition, Zaporojan's new evidence does not make a prima facie showing that Zaporojan is eligible for relief under CAT.  To establish eligibility for CAT relief, an applicant must demonstrate that it is more likely than not that he would be tortured by, or with the acquiescence of, the government, if he is removed to the designated country of removal.  8 C.F.R. §§ 208.16(c)(2), 208.18(a)(1).  Zaporojan's evidence does not show that the Moldovan government is likely to torture him or acquiesce in his torture.

Finally, we find no merit to Zaporojan's argument that the BIA failed to adequately consider his new evidence.  The BIA is not required to address each piece of evidence individually, so long as it considered the issues raised in the motion and announced its decision in a way that demonstrates it "heard and thought and not merely reacted."  Ayala v. U.S. Att'y Gen., 605 F.3d 941, 948

9

(11th Cir. 2010) (quotation marks omitted); <u>Tan v. U.S. Att'y Gen.</u>, 446 F.3d 1369, 1374 (11th Cir. 2006).

Here, the BIA referred to Zaporojan's new evidence, which it (correctly) described as "limited," and concluded that it did not show a "reasonable possibility" that Zaporojan "would be targeted" on account of a protected ground or "make a <u>prima facie</u> showing" for CAT relief. Thus, Zaporojan's evidence "did not meet the requirements" for reopening, i.e. would not change the outcome of his removal proceedings. The BIA's explanation, though brief, was sufficient to allow for appellate review of its decision.

For all these reasons, we cannot say the BIA abused its discretion in denying Zaporojan's motion to reopen.

**PETITION DENIED.**