[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15378
Non-Argument Calendar
_____

Agency No. A070-704-012

WEN-XING WANG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(August 22, 2017)

Before MARCUS, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

Wen-Xing Wang, a citizen of China, seeks review of a final order of the Board of Immigration Appeals ("BIA") denying his motion to reopen his removal proceedings under the Immigration and Nationality Act ("INA") § 240(c)(7), 8 U.S.C. § 1229a(c)(7), and 8 C.F.R. § 1003.2(c). Wang's motion to reopen was based on his claim that country conditions in China have changed since the BIA's August 31, 2006, removal order because China has modified its policy regarding the treatment of couples who return to China with children born abroad, and the controlling regulations reflect that sterilization is now mandatory for such couples. Because Wang has three children who were born in the United States, he contends that he would be subject to forced sterilization upon his return to China. After careful review of the record and consideration of the arguments presented, we must deny Wang's petition.

## I.

Wang entered the United States on August 25, 1992, without having been admitted or paroled. In 1993, he filed an affirmative application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"), based on his religion.

In 2003, the Department of Justice placed Wang in removal proceedings and issued a Notice to Appear, which charged that he was removable under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i). Subsequently, Wang filed an

Application for Suspension of Deportation and an Application for Cancellation of Removal.

In August 2006, Wang refiled his application for asylum, withholding of removal, and CAT relief, reasserting his fear of persecution based on his religion. But at a removal hearing before an immigration judge ("IJ") on August 31, 2006, Wang withdrew his applications and was granted voluntary departure.[1]

Instead of leaving the United States, in 2008, Wang filed a motion to reopen removal proceedings on the ground that he had violated China's family-planning policy by having two U.S.-born children and would be subjected to forced sterilization if returned to China. In his 2008 motion, Wang alleged that previously unavailable evidence indicated a change in country conditions concerning an increase in forced sterilization for individuals with two or more children in Fujian Province, his home province. The IJ denied Wang's motion to reopen, and the BIA dismissed Wang's appeal of the IJ's decision. Wang then filed a petition for review of the BIA's decision, which we denied. *See Wang v. U.S. Att'y Gen.*, 379 F. App'x 827 (11th Cir. 2010).

In April 2016, Wang filed another motion to reopen removal proceedings on the ground that new and previously unavailable documents showed a material

---

[1] Wang's assertions of fear of persecution based on his religion are not at issue in this appeal. Rather, we mention them for purposes of explaining how Wang's case came to be before us.

3

change in China's country conditions since 2006, regarding increased enforcement of China's family planning policy.  In July 2016, the BIA again denied Wang's motion, concluding that the evidence he submitted was insufficient to support his claim of an official policy change regarding couples returning to China with foreign-born children or his claim that the law in his home province of Fujian now mandated sterilization for such couples.  The BIA also determined that Wang did not establish *prima facie* eligibility for relief.  The BIA's July 2016 decision forms the basis for the instant appeal.

On appeal, Wang argues that the BIA abused its discretion by failing to meaningfully consider his evidence, which he contends demonstrates a material change in country conditions since 2006.  He asserts that changed country conditions include a systematic increase in cases of forced sterilization in Fujian Province and a new policy mandating sterilization of returning Chinese parents with children born abroad.  He further alleges the he demonstrated *prima facie* eligibility for relief.

## II.

We review the denial of a motion to reopen for abuse of discretion.  *Jiang v. U.S. Att'y Gen.*, 568 F.3d 1252, 1256 (11th Cir. 2009).  Our review is limited to determining whether the BIA exercised its discretion in an arbitrary or capricious manner.  *Id*.  Motions to reopen are especially disfavored in removal proceedings.

*Ali v. U.S. Att'y Gen.*, 443 F.3d 804, 808 (11th Cir. 2006) (quoting *INS v. Doherty*, 502 U.S. 314 (1992)).

We have held that, at a minimum, the BIA may deny a motion to reopen on the following three grounds: (1) failure to establish a *prima facie* case; (2) failure to introduce material and previously unavailable evidence; or (3) a determination that an alien is not entitled to a favorable exercise of discretion despite statutory eligibility for relief. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1302 (11th Cir. 2001).

When reviewing a motion to reopen, the BIA need not address each claim the petitioner made or each piece of evidence the petitioner presented as long as it has given reasoned consideration to the petition and made adequate findings. *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006). In other words, the BIA must "consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* (citation omitted) (internal quotation marks omitted).

## III.

A party may file only one motion to reopen removal proceedings, and that motion "shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." INA § 240(c)(7)(A), (B); 8 U.S.C. § 1229a(c)(7)(A), (B). Generally, the motion to reopen must be filed within ninety days of the date of entry of the

5

BIA's final administrative removal order. INA § 240(c)(7)(C)(i); 8 U.S.C. § 1229a(c)(7)(C)(i). An exception to the time and number limitations applies if the motion to reopen is for the purpose of reapplying for relief "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii); *see* INA § 240(c)(7)(C)(ii); 8 U.S.C. § 1229a(c)(7)(C)(ii). To be "material," the evidence must be the sort that, if the proceedings were reopened, would likely change the outcome of the case. *See Ali*, 443 F.3d at 813. An alien who attempts to show that the evidence is material bears a "heavy burden." *Jiang*, 568 F.3d at 1256.

Because Wang filed his motion to reopen nearly 10 years after his 2006 removal hearing, he was required to demonstrate materially changed country conditions in order to overcome the time bar. 8 C.F.R. § 1003.2(c)(3)(ii). We have recognized that a government's escalated efforts to enforce an existing coercive policy may support a finding of changed country conditions necessary to excuse an untimely motion to reopen. *See Jiang*, 568 F.3d at 1252; *see also Li v. U.S. Att'y. Gen.*, 488 F.3d 1371 (11th Cir. 2007). More specifically, we have concluded that evidence of "a recent increased campaign of forced sterilization in the alien's home village" may satisfy the requirement of changed country

6

conditions. *Jiang*, 568 F.3d at 1252. In contrast, the birth of a child constitutes a change in personal circumstances, not a change in country conditions. We previously noted this difference when addressing Wang's prior appeal. *See Wang*, 379 F. App'x at 828. Wang's problem here is that, unlike in *Jiang*, we cannot find that the BIA abused its discretion when it denied Wang's motion to reopen because Wang's evidence did not demonstrate changed country conditions—it did not show that China changed its policy regarding U.S.-born children, nor did it show an increased campaign of forced sterilization in Wang's home village.

In *Jiang*, a Chinese citizen was ordered removed in 1999 and filed a motion to reopen in 2007, alleging changed country conditions. Jiang asserted that she was fearful she would be persecuted if returned to China because she had married and given birth to two children in the United States, in violation of China's one-child policy. *Jiang*, 568 F.3d at 1254. She further contended that violation of the policy could lead to her forced sterilization upon return to China. *Id.* In support of her motion to reopen, Jiang offered previously unavailable evidence that officials in the Fujian Province and, more particularly, in her hometown, had increased enforcement of the one-child policy by "forcibly sterilizing parents with more than one child." *Id.* at 1255.

We granted Jiang's petition and rejected the BIA's reasoning that the motion to reopen presented merely a change in personal circumstances. *Id.* at 1257–58.

Noting that the BIA did not find any of Jiang's evidence incredible, we held that the BIA improperly overlooked supporting evidence of an increase in forced sterilization in her province and her hometown in particular.  Jiang's evidence included affidavits, the codification of the Population and Family Planning law in 2002, and the corroborating reports detailing physical coercion and "remedial measures" taken to enforce the policy.  *See id.* at 1258.  We found that the IJ and BIA wrongly focused on the fact that coercive family planning policies had been in effect in China since 1979 and "ignor[ed] the crux of Jiang's petition: that China's family planning laws were being more stringently enforced in her hometown and that this led to forced sterilizations."  *Id.*

*Jiang* is distinguishable from Wang's case in at least two significant ways. First, unlike in *Jiang*, in which the BIA overlooked or inexplicably discounted evidence that the petitioners provided, here, the BIA cited at length to the documents Wang filed, which included evidence from both before and after Wang's 2006 removal hearing.  On this record, we cannot say that the BIA abused its discretion in discounting some of the documents, and the BIA was not required to specifically address each piece of evidence.  *See Tan*, 446 F.3d at 1374.  Instead, the BIA gave reasoned consideration to Wang's motion, cited the documents submitted, and announced its decision in sufficient terms.  *See id.*

Second, although Wang's evidence supported an inference that the Chinese government's enforcement of its family-planning policy unfortunately resulted in instances of forced sterilizations, the evidence did not show any significant worsening of these strategies since 2006. Unlike the circumstances in *Jiang*, where the petitioner's initial application was denied three years before the 2002 codification of China's family-planning policy, at the time of Wang's hearing in 2006, China's policy (i) was national in scope, but enforced on a provincial or local level; (ii) was usually enforced through oppressive social compensation fees and other administrative measures; (iii) required "remedial measures" for out-of-plan pregnancies in Fujian Province; and (iv) resulted in forced abortions and sterilizations. United States Department of State reports reveal that all of these characteristics of China's family planning policy were present in 2005, before Wang's hearing, and after, in 2007. The annual reports by the Congressional-Executive Commission on China from 2009 through 2014 contain similar language, revealing that country conditions were relatively consistent from 2005 forward.

Wang's new evidence is insufficient to prove a systematic increase in cases of forced sterilization in his home village of Fuqui Village, Houyu Town, Changle City in Fujian Province since the time of his hearing in August 2006. And several documents in the record indicate that officials in Fujian Province used coercive

9

practices, including forced abortions and sterilizations, both before and after Wang's 2006 proceedings. The 2005 U.S. State Department's Country Profile on China revealed that officials forcibly performed sterilizations and abortions at that time. In fact, the 2007 U.S. State Department's Country Profile on China explained that there were reports of forced sterilizations in Fujian Province in 2006—the year of Wang's hearing. Therefore, ample evidence in the record supports the BIA's conclusion that Chinese officials consistently used coercion, including forced sterilization and more often social compensation fees, to enforce its family planning policy.

Wang relies on a portion of the 2009 Annual Report of the Congressional-Executive Commission on China ("CECC Report"), asserting that country conditions began to materially worsen between 2008 and 2009 because, as he describes it, "'the use of coercive measures' to enforce family planning policy was now 'commonplace.'" But in actuality, the actual sentence from the 2009 CECC Report on which Wang relies, at best, indicates a continuing use of coercive measures such as sterilization rather than a change in policy enforcement: "The use of coercive measures in the enforcement of population planning policies *remains* commonplace . . . ." (emphasis added). The report also references the fact that central and local authorities *continued* to interfere with and control the reproductive lives Chinese citizens.

10

Although Wang asserts that enforcement materially changed because the government now requires mandatory forced sterilizations for violators of the policy, without exception, the 2014 CECC Report said that there was "at least one reported forced sterilization." Unfortunately, the circumstances do not reflect a material change in enforcement procedures from the time of Wang's 2006 hearing.

The campaigns and the use of targets and quotas were also longstanding practices in implementing the one-child policy. Although they "reflect an emphasis on strengthening enforcement measures," they were sporadic, limited in duration, and did not appear to be different from previous campaigns. Accordingly, the BIA acted within its discretion to conclude that, while some of the evidence showed "renewed efforts" at enforcing the policy, with sporadic use of physical coercive practices, that evidence did not describe a significant change in the family-planning policy.

## IV.

Finally, Wang also alleges a material change in policy relating to citizens returning to China with their foreign-born children. He argues that in Fujian Province in 2006, children born abroad, if not registered as permanent residents of China, were not counted against the number of children allowed under China's family-planning law. Wang cites to the 2007 U.S. State Department's Country Profile on China in support of his argument. But, Wang contends, new evidence,

11

including official government documentation from Fujian Province, indicates that children born abroad (including his three U.S.-born children) are now counted under the one-child policy. In other words, Wang claims that since 2007, sterilization has become mandatory for Chinese couples with two or more foreign-born children.

While Wang accurately cites to the 2007 Country Profile, we cannot find that the BIA abused its discretion when it concluded that evidence was insufficient to support Wang's claim of an official policy change regarding the treatment of couples who return to China with children born abroad. First, a 2006 document published by China's Administrative Office of the National Population and Family Planning Committee contradicts the 2007 Country Profile. It reveals that in 2006 and according to relevant regulations of Fujian Province, "as long as a couple are both citizens of China, they are subject to the Family Planning Laws of China, regardless of where their children are born." Consequently, the document supports a finding that in 2006, at the time of Wang's removal hearing, foreign-born children would be counted towards China's family-planning policy.

Other documents likewise show that the policy is not new. The 2004 and 2005 U.S. State Department's Country Profile on China both note that a family returning to China with a U.S.-born child or children would not be treated differently than a family with children born in China. These families receive "no

12

special treatment under family planning laws," meaning that foreign-born children were included under the one-child policy at that time.

Because the evidence contradicts Wang's assertion that the policy has changed regarding foreign-born children, the BIA acted within its discretion when it concluded that the evidence was insufficient to support his claim. Nor, for the reasons previously discussed, did the BIA abuse its discretion when it rejected Wang's argument that the enforcement of the policy has taken a materially more coercive direction.

## V.    CONCLUSION

We are sympathetic to Wang's concerns about forced sterilization upon his return to China. But the standard for granting his petition requires a finding that the BIA abused its discretion in determining that country conditions in China had materially changed since Wang's hearing. That he has not done. For this reason, we must conclude that the BIA did not abuse its discretion in denying his motion to reopen.[2]

**PETITION DENIED.**

---

[2] Because the BIA did not abuse its discretion in holding that the country conditions in China had not changed, we do not address Wang's argument regarding his *prima facie* eligibility for relief.